IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | |
|---|---|
| CATHERINE LAWTON, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CAROLYN W. COLVIN, )<br>Acting Commissioner )<br>of Social Security, )<br>)<br>Defendant. ) | Case No. 3:15-cv-05124-NKL |

**ORDER**

Plaintiff Catherine Lawton seeks review of the Administrative Law Judge's decision denying her application for Social Security Disability Insurance benefits. For the following reasons, the decision of the ALJ is affirmed.

**I.  Background**

**A.  Medical History**

Lawton alleges disability beginning on January 26, 2013. She states that she suffers from foot and back pain as well as psychological diagnoses.

On June 19, 2011, Lawton presented to the emergency room complaining of acute and chronic pain in her left lower back. She stated that her symptoms began six months earlier. She was prescribed Flexeril and Vicoprofen. On June 28, she slipped in the shower which resulted in a sacrum and coccyx contusion. An MRI showed mild multilevel lumbar spondylosis but no evidence of fracture or other abnormalities.

1

On January 26, 2012, Lawton went to Jordan Valley Community Health Center to refill psychiatric medications and for a prenatal visit. Dr. Andrea Greiner refilled her prescriptions for Trazodone, Lamictal, and Prozac, but did not refill Lawton's prescriptions for Xanax and Hydrocodone due to the pregnancy. On February 8, 2012, Dr. Robert Fraser noted that Lawton's control of her bipolar disorder was suboptimal because she had stopped taking her medications due to her concerns about their effect on the fetus. Dr. Fraser diagnosed her with depressive disorder and advised her to resume taking her medications.

On February 16, Dr. Yvonne Agius refused to refill Lawton's prescription of Hydrocodone as Dr. Greiner had done weeks earlier. On April 25, Dr. Fraser also denied Lawton's request to refill her psychiatric medications.

On May 4, 2012, Lawton began to see Dr. Salvador Ceniceros, a psychiatrist, and stated that she had suffered abuse during her childhood. Dr. Ceniceros noted that her symptoms included dysphoria, agitation, irritability, nightmares, and recurrent memories and flashbacks. He diagnosed her with PTSD and major depression. Lawton was prescribed Pristiq, but on May 10 Dr. Ceniceros changed her prescription due to Lawton's reaction to Pristiq. Her medications were again adjusted on May 17 and 31.

On September 13, Dr. Ceniceros noted that Lawton was manic and cycling ten days after childbirth, and recommended that she return in a month to monitor her postpartum depression. On October 9, the doctor observed that Lawton was dysphoric and tearful and increased her Prozac prescription.

2

Case 3:15-cv-05124-NKL   Document 12   Filed 06/27/16   Page 2 of 14

On November 12, 2012, Lawton presented to the emergency department after she fell while climbing stairs and injured her left large toe. The emergency department advised her to wear a surgical boot and take pain medication as needed. A few days later, Lawton re-injured her left foot, resulting in worse pain and bruising. The emergency department advised her to use ice, rest, and elevate her foot. On November 23 she returned to the emergency department complaining of severe cramps and pain in her foot. She was given medication and discharged in stable and improved condition.

On December 3, Lawton began to see Dr. Geoffrey Bricker, a podiatrist. Dr. Bricker determined that the tibial sesamoid of her left foot was fractured. She was unable to afford surgery at that time, so Dr. Bricker gave her a prescription for Percocet. On December 21, the doctor performed an open treatment of the fracture. On February 19, 2013, the doctor diagnosed hallux malleus and subsequently performed a procedure for arthrodesis of the hallux interphalangeal joint. On June 6, the doctor removed the screw in the left hallux due to complications with the internal device. When Lawton returned for a follow-up appointment on June 27, she reported that her pain was much decreased and she was having minimal pain with palpation and range of motion. However, on November 7 Lawton reported pain in the first metatarsophalangeal joint of her left foot. Dr. Bricker diagnosed Lawton with capsulitis and an ingrown toenail and offered a prescription and a steroid injection. Lawton declined both, but surgery was scheduled for treatment of a nail deformity.

On December 12, 2012, and November 1, 2013, Dr. Ceniceros completed mental medical source statements for Lawton. He noted in 2012 that she had marked limitations

3

in nine areas of mental functioning. In the 2013 statement, the doctor opined that Lawton had marked limitations in only five areas of mental functioning. A consulting psychiatrist also reviewed Lawton's file, but concluded that there was insufficient evidence to determine whether she was capable of maintaining substantial gainful activity because Lawton failed to submit a form regarding her activities of daily living.

### B. ALJ Decision

The ALJ denied Lawton's request for disability benefits, concluding that she had the Residual Functional Capacity ("RFC") to engage in substantial gainful activity. The ALJ concluded that despite Lawton's severe impairment of Post-Traumatic Stress Disorder ("PTSD"), she retained the following RFC:

> [T]o perform a range of work at all exertional levels. The claimant is able to perform simple, repetitive tasks. She can occasionally interact with supervisors, co-workers, and the general public. The claimant is precluded from work at a production pace that requires sustained, fast-paced activity or meeting explicit quotas, deadlines, or goals. Otherwise, work at a normal production pace is not ruled out.

[Tr. 17]. The ALJ afforded Dr. Ceniceros's Medical Source Statement regarding the extent of Lawton's mental impairments "little weight," concluding that they were inconsistent with his treatment notes and Lawton's statements regarding her mental state and her activities of daily living.

In determining the RFC, the ALJ considered the medical evidence of the record, as well as Lawton's testimony at the administrative hearing regarding the extent of her symptoms. At the administrative hearing, Lawton testified that she drove about once a month. She stated she can only walk for five to ten minutes, stand for seven minutes, and

4

sit for twenty minutes at a time. Lawton stated that she can only lift ten pounds at a time, but lifts her daughter who weighs approximately thirty pounds. She does not deal with strangers or handle stress well.

Following this testimony, the ALJ questioned a vocational expert regarding Lawton's RFC. The vocational expert testified that a person with Lawton's RFC would be able to perform jobs such as a photocopy machine operator, cleaner (housekeeper), table worker, and addresser.

## II. Standard of Review

"[R]eview of the Secretary's decision [is limited] to a determination of whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision 'simply because some evidence may support the opposite conclusion.'" *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Substantial evidence is "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Gragg v. Astrue*, 615 F.3d 932, 938 (8th Cir. 2010).

## III. Discussion

Lawton argues that the ALJ erred in 1) failing to provide sufficient evidence to support the RFC, 2) failing to find her tibial sesamoid or capsulitis to be a severe impairment, and 3) failing to perform a proper credibility analysis.

### A. RFC Determination

5

Lawton argues that remand is necessary because after discounting the opinion of the treating psychiatrist, the ALJ failed to point to any medical evidence to support the RFC assessment, and instead relied on treatment notes with Lawton's psychiatrist indicating that she was stable and doing well on medications.

A Social Security claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." *Masterson v. Barnart*, 363 F.3d 731, 737 (8th Cir. 2004). The RFC must be supported by some medical evidence of the claimant's ability to function in the workplace. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

In evaluating and weighing doctors' opinions to make the RFC determination, the ALJ is to consider a number of factors including (1) the existence of an examining relationship, (2) the existence of a treating relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the person rendering the opinion, and (6) other factors supporting or contradicting the opinion. 20 C.F.R. § 404.1527(c).

In general, a treating physician's opinion is entitled to deference. "If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight." SSR 96-2p. Even when a treating source's opinion is not entitled to controlling weight, it "should not ordinarily be disregarded and is entitled to substantial weight." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). However, because the record must be evaluated as a whole, "[a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or

6

where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Medhaug v. Astrue*, 578 F.3d 805, 815 (8th Cir. 2009) (quoting *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005)).

Contrary to Lawton's contentions, the fact that the ALJ discounted Dr. Ceniceros's opinions regarding Lawton's limitations does not mean that the RFC is unsupported by medical evidence. The ALJ observed that he accorded little weight to the opinions not due to the infrequency of the doctor's visits with Lawton, but due to "the lack of consistency and support" for the opinions:

> As to consistency, the two opinions both indicate many marked limitations, but there are only three areas that are markedly limited on both forms. The treatment records from Dr. Ceniceros do not contain evidence of significant changes in the claimant's functioning that would explain the difference between the two opinions. Thus, the lack of consistency detracts from the weight afforded to these opinions.

[Tr. 20]. The Court has reviewed Dr. Ceniceros's treatment notes and assessment forms and found the ALJ's description of this evidence to be accurate. Thus, substantial evidence supports the ALJ's decision not to afford significant weight to Dr. Ceniceros's opinions.

Even though the ALJ discounted Dr. Ceniceros's opinion, the record contains medical evidence to support the RFC. The ALJ included limitations in the RFC to account for Lawton's psychological limitations. Specifically, the ALJ noted that "The claimant is able to perform simple, repetitive tasks. She can occasionally interact with supervisors, co-workers, and the general public. The claimant is precluded from work at a production pace that requires sustained, fast-paced activity or meeting explicit quotas,

deadlines, or goals. Otherwise, work at a normal production pace is not ruled out." These limitations are consistent with Dr. Ceniceros's treatment notes, which consistently indicated that Lawton was doing well on her medications. While she required some modifications to her medications in May 2012, by June 2012 her medication regimen had stabilized and the doctor noted that she was doing "very, very well." [Tr. 235]. In September 2012 the doctor noted that she was "a little bit manicky and cycling a little" as she was ten days postpartum, [Tr. 233], but by December 2012 things had normalized and the doctor again noted that she was doing "very, very well with her medications," [Tr. 229]. Consistent with Dr. Ceniceros's opinions in the Medical Source Statements, the ALJ included limitations on Lawton's social interaction and concentration and persistence restrictions.

Lawton cites two cases for the proposition that the ALJ's dismissal of Dr. Ceniceros's opinions regarding Lawton's functioning means that the record lacks sufficient medical evidence to support the RFC. However, neither *Lauer v. Apfel*, 245 F.3d 700 (8th Cir. 2001), nor *Hutsell v. Massanari*, 259 F.3d 707 (8th Cir. 2001), stand for the proposition that the ALJ's decision not to accord significant weight the medical opinions of the evidence necessarily means that the record lacks sufficient medical evidence to make a RFC determination.

In *Lauer*, the ALJ disregarded a multitude of doctor's opinions all indicating that the claimant had limitations in significantly more areas than reflected in the RFC. The ALJ also rejected the only medical analysis of objective test results in the record and substituted his own opinion of the results without submitting them elsewhere for

8

interpretation by a medical expert. Unlike *Lauer*, the record in this case contains Medical Source Statements from only one physician whose treatment notes are in conflict with the severe limitations opined in the statements. Nothing in Dr. Ceniceros's treatment notes suggests that Lawton is incapable of interacting with the public or focusing on a task to such an extent that she could not maintain substantial gainful employment.

In *Hutsell*, the claimant had a history of hospitalization for unpredictable psychotic episodes that were not managed by medication. Numerous physicians and psychiatrists opined that the claimant could not work and all opined that the claimant was more limited than found by the ALJ. *Hutsell* is distinguishable from this case, as nothing in the record indicates that Lawton has ever been hospitalized for a psychotic episode or suggests that she might endure periods of decompensation even with medication for her psychological symptoms. Moreover, the ALJ in this case did not disregard the opinion of the consulting psychiatrist as occurred in *Hutsell*. Lawton emphasizes the fact that the consulting physician in this case concluded that there was insufficient evidence to determine her limitations with regard to social functioning, concentration, persistence, and pace. However, in reaching this conclusion the consulting physician noted that "The claimant has failed to return the ADL [activities of daily living] information needed to evaluate function. We have made several attempts to obtain this information. . . . Evidence of record is insufficient to establish a disabling impairment at this time." [Tr. 79]. Thus, the physician's opinion that the evidence regarding Lawton's ability to function was inclusive was not the result of inconclusive medical evidence, but of Lawton's failure to provide the necessary documentation regarding her activities of daily living.

9

Case 3:15-cv-05124-NKL   Document 12   Filed 06/27/16   Page 9 of 14

While the consulting psychiatrist was not provided evidence of Lawton's activities of daily living, Lawton provided a great deal of testimony on her activities of daily living at the administrative hearing. Lawton testified that she could lift no more than ten pounds, but then admitted to lifting and carrying her daughter who weighs twenty-eight to thirty pounds. She testified that she is the sole care provider for her eighteen month old daughter during the day while her mother is at work, though she stated that her mother sometimes comes home in the middle of the day to check on them. She also testified that she washes dishes and helps with laundry.

While the Court recognizes that an ability to perform some activities of daily living is not necessarily evidence of an individual's ability to function in a working environment, in this case Lawton's activities of daily living provide substantial evidence for the ALJ's conclusion that Lawton is capable of maintaining substantial gainful activity as limited in the RFC. Lawton's ability to provide unassisted full time care of her very young daughter while her mother works full time indicates that Lawton is capable of at least minimal social interaction and is capable of focusing on prolonged tasks.

In light of the evidence of Lawton's activities of daily living and Dr. Ceniceros's treatment notes indicating that Lawton's psychological impairments are well managed by medication, the record provides substantial evidence to support the RFC determination.

### B. Evaluation of Severe Impairments

Next, Lawton argues that the ALJ should have included her fractured tibial sesamoid or capsulitis as a severe impairment.

"An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities. . . . Examples of these include – (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting." 20 C.F.R. § 404.1521. In order to be considered a disability, the "inability to engage in any substantial gainful activity by reason of . . . impairment . . . can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also Barnhart v. Walton*, 535 U.S. 212 (2002) (interpreting § 423(d)(1)(A)). "Severity is not an onerous requirement for the claimant to meet, . . . but it is also not a toothless standard . . . ." *Kirby v. Astrue*, 500 F.3d 705, 708 (8th Cir. 2007).

Lawton fractured her tibial sesamoid in November 2012, approximately two months before her alleged onset date. She had surgery on her foot on December 21, 2012 and again in February 2013 to adjust a screw that was protruding into her joint. Six weeks after the screw was adjusted Lawton reported decreased pain. Dr. Bricker noted "Examination reveals that the toe is in excellent alignment and there is no movement at the fusion site. The patient does have active plantarflexion and dorsiflexion. It is less than normal at this point. Swelling is also normal." [Tr. 222]. In June, the screw was removed from her toe and Lawton reported significantly decreased pain. On June 27,

11

2013, Dr. Bricker discharged Lawton from treatment as her pain was minimal and examination revealed that the incision was well healed. [Tr. 288].

In November 2013, Lawton again complained of pain in her toe and exhibited some swelling and tenderness. Dr. Bricker noted that there was no history of trauma. On examination, the doctor recorded "There is excellent alignment in the toe. The hallux nail is noted to be incurvated and tender with pressure at the borders." [Tr. 339]. Dr. Bricker gave Lawton a prescription for pain medication and Lawton declined to receive a steroid injection. She was advised of treatment alternatives for the nail deformity and scheduled surgery for it.

Substantial evidence supports the ALJ's conclusion that Lawton's foot problems did not constitute a severe impairment. Though Lawton received a great deal of treatment on her toe between November 2012 and June 2013, Dr. Bricker discharged her from treatment at the end of June because he concluded that her toe was well healed. The problems that Lawton sought treatment for in November 2013 were largely separate. Dr. Bricker noted on examination of her toe that the alignment was still excellent. The treatment the doctor advised her about largely related to her ingrown toenail, which Lawton and Dr. Bricker planned to address through surgery. Nothing in the record indicates that the problems from the ingrown nail were expected to last more than twelve months to constitute a severe impairment.

While Lawton claims that after June the pain in her toe from the November 2012 injury continued and increased, the record provides substantial evidence to support the ALJ's conclusion that any residual pain from the capsulitis did not constitute a severe

12

impairment. After June 2013 Lawton never saw a doctor about pain in her toe until November 2013 when she presented with the ingrown toenail. Moreover, Dr. Bricker's notes consistently stated that Lawton exhibited a normal, steady gait and station, even during recovery from her two surgeries. These notes are inconsistent with Lawton's current claims of disabling pain in her foot and suggest that Lawton's complaints about the current severity of her pain from the initial injury are not credible.

### C. Credibility Evaluation

Finally, Lawton argues that the ALJ erred in evaluating her credibility by failing to provide an adequate explanation of her reasons for discounting Lawton's testimony.

Credibility determinations are left primarily to the ALJ. *Baldwin v. Barnhart*, 349 F.3d 549, 558 (8th Cir. 2003). In analyzing a claimant's subjective complaints, the ALJ is to consider the entire record including the claimant's medical records, third party statements, the claimant's statements, and factors including (1) the claimant's activities of daily living; (2) the duration, frequency, and intensity of pain and other symptoms; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).

The ALJ provided numerous reasons for discounting Lawton's testimony regarding the extent of her disability. She noted that Lawton is able to maintain an independent residence and care for her very young daughter. The record also shows that Lawton's PTSD is stable with the existing level of treatment and Lawton reported doing well on medications. While the record shows that Lawton experienced some psychiatric

13

problems in the days immediately after she gave birth to her daughter and while enduring some other personal stressors, her medications were consistently effective once adjusted appropriately and there is no evidence in the record that her psychiatric problems have ever prevented her from caring for her daughter or living independently with minor aid of her mother. The RFC contains restrictions to address the limitations the ALJ found credible. The ALJ's explanation of her credibility evaluation is sufficient, and the record provides substantial evidence to support the RFC and ALJ's decision to discount Lawton's credibility.

## IV. Conclusion

For the reasons set forth above, the decision of the ALJ is affirmed.

<u>/s/ Nanette K. Laughrey</u>
NANETTE K. LAUGHREY
United States District Judge

Dated: <u>June 27, 2016</u>
Jefferson City, Missouri